UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
UNITED STATES OF AMERICA,

                                                            19-cr-395 (PKC)

             -against-                                      OPINION
                                                            AND ORDER

VANCE COLLINS, a/k/a "Big AK," and
RAMON RAMIREZ, a/k/a "Obendy,"

                         Defendants.
---------------------------------------------------------x

CASTEL, U.S.D.J.:

             Defendant Vance Collins was arrested outside of his home on the morning of June

13, 2019.  Collins moved to suppress the firearms seized from his home along with his post-

arrest statements before receiving Miranda warnings, on the ground that he did not consent to

law enforcement officers entering his house.  The Court held an evidentiary hearing on the

motion on July 22, 2020.  (See Hr'g Tr. (Doc 91, Ex. A.))  Both the government and Collins

have made post-hearing submissions.  For the reasons set forth below, Collins's motion will be

denied.


BACKGROUND

             Defendants Vance Collins and Ramon Ramirez are charged with participation in a

murder-for-hire conspiracy and a substantive count of murder-for-hire, in violation of 18 U.S.C.

§§ 1958 and 2.  (Superseding Indictment (Doc 38).)  In addition, Collins is charged with being a

felon in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1) and (2).  (Id.)  At an

earlier stage of the case, the Court held a hearing on the defendants' respective motions to

suppress and to dismiss the indictment for lack of jurisdiction.  (See Doc 34.)  At that time,

Collins sought to suppress the firearms recovered from his home on the day of his arrest.  The Court stated that it would accept an affidavit from Collins as to the issue of his consent or lack thereof, and, if necessary, would hold an evidentiary hearing on the issue.  (Doc 34 at 18-19.)  To obviate the need for an evidentiary hearing, the government represented that it would not be using Collins's post-arrest, pre-Miranda statements at Collins's house as to the location of the firearms, but would offer the firearms themselves as evidence (id. at 21); Collins's then-counsel agreed that the firearms would not be suppressible due to any Miranda violation.  (Id.)

Thereafter, Collins's newly-appointed counsel requested an evidentiary hearing on the issue of whether Collins consented to law enforcement agents entering his house on the day of his arrest (Doc 42), and subsequently submitted a declaration from Collins stating that he did not consent to the agents' entry.  (Doc 50-1.)  The Court ordered an evidentiary hearing. (Doc 52.)

The facts below are taken from the testimony at the evidentiary hearing held on July 22, 2020.[1]  At the hearing, the government called two witnesses who participated in Collins's arrest: Special Agent Brendan Kenney of the FBI, and Detective James Menton of the New York City Police Department.  Detective Menton is assigned to a joint task force with the FBI.  (Kenney Dir. at 8-9; Menton Dir. at 47.)  After the government rested, Collins testified on his own behalf.  (Collins Dir. at 97-98.)

Collins was arrested outside of his home on Barnes Avenue in the Bronx at around 6:15am on June 13, 2019.  (Kenney Dir. at 14-15; Kenney Cross at 30; Menton Dir. at 51; Collins Cross at 109.)  Collins came outside to catch up with a sanitation truck.  (Kenney Dir.

---

[1] All citations to witness testimony are to the hearing transcript (Doc 91, Ex. A).  The citation to particular evidence or testimony is illustrative and is not intended to imply that it is the only evidence to support a statement or finding. Despite the ongoing COVID-19 pandemic, all witnesses testified live in open Court.

at 17; Kenney Cross at 30; Menton Dir. at 51; Collins Dir. at 102.)  After Collins disposed of his

garbage, law enforcement, who had been stationed near his residence and were surveilling the

house, surrounded Collins and arrested him on the street.  (Kenney Dir. at 13-15; Collins Dir. at

103-104.)  At the hearing, the Court took judicial notice of the low and high temperatures

recorded in the Bronx, New York on June 13, 2019: the low was 57 degrees Fahrenheit, and the

high was 65 degrees Fahrenheit.  (Hr'g Tr. at 4-8; Gov't Ex. 1.)

What happened next is at the heart of the present dispute.  Detective Menton

testified: "I explained to him: 'You must be cold.  You're shaking like a leaf.'  He did say: 'Yes,

I'm cold.  Can I go get my jacket?'  At that point I agreed that he can go inside his residence and

get his jacket."  (Menton Dir. at 53; see also Menton Cross at 72: "I said he looked like he was

freezing, and he said he was cold, and that's when he said he'd like to get a jacket.")  Detective

Menton testified that he explained to Collins that in order to retrieve a jacket from inside the

house, law enforcement would have to enter the house with Collins, and that law enforcement,

including SWAT team members, would conduct a protective sweep of the house.  (Menton Dir.

at 53.)  Detective Menton testified that Collins consented to these terms of entering his house.

(Menton Dir. at 53-54;  Menton Cross at 72-73, 78-79.)  After entering the home, Detective

Menton asked Collins if there were any firearms in the residence, and Collins said that there

were three.  (Menton Dir. at 58.)  Law enforcement recovered the firearms with Collins's

assistance.  (Id.; Kenney Dir. at 24.)

It is undisputed that Collins was not read his Miranda rights at this time.  (Hr'g

Tr. at 123.)  It is also undisputed that law enforcement did not have a search warrant for Collins's

residence.  (Kenney Cross at 27-28; Menton Cross at 83-84.)  Detective Menton testified that if

Collins had not asked for a jacket, law enforcement would not have entered Collins's home on

- 3 -

the day of the arrest (Menton Cross at 85-86); both Special Agent Kenney and Detective Menton

testified that the arrest plan did not include entry into Collins's home.  (Kenney Dir. at 13-14;

Kenney Cross at 37-39; Menton Dir. at 49, 60-61.)  Special Agent Kenney was not present for

the exchange between Detective Menton and Collins (Kenney Dir. at 19; Kenney Cross at 39-

40); Special Agent Kenney testified that Detective Menton told him that Collins had requested to

get a jacket.  (Kenney Cross at 39-40.)

       Collins's version of events is quite different.  Collins testified that he neither

requested a jacket nor consented to law enforcement entering his house after he was arrested.

(Collins Dir. at 107-109.)  Collins testified that after he was arrested, Detective Menton told

another officer that they were "bringing [Collins] inside the house," but that Collins never

consented to this entry.  (Id. at 106.)  Collins further stated that Detective Menton did not explain

to Collins that there would be a search of the residence.  (Id. at 106, 108.)

       Collins testified that he did not request a jacket and that he was not cold.  (Collins

Dir. at 107-108.)  He did not, however, dispute that he was shaking, but testified that he was

scared at the time of his arrest because the arresting officer (Detective Menton) was threatening,

and allegedly insinuated that "something could happen to [Collins's] girlfriend or [his] dog if

[he] didn't cooperate with [the officers]."  (Id. at 107.)  Detective Menton testified that he did not

hear anyone threaten Collins's dog, nor did he make such a threat.  (Menton Dir. at 55.)  Before

law enforcement entered his house, Collins told the officers that his dog was in the backyard and

that his girlfriend was asleep inside; the officers called her to the front door so they could see

her.  (Kenney Dir. at 20-22; Kenney Cross at 25; Menton Dir. at 54, 56-57; Collins Dir. at 107;

Collins Cross at 110, 113.)

On cross examination, Collins stated that he did not object to Detective Menton escorting him inside the house, nor did he ever ask the officers to leave his house. (Collins Cross at 110-11.) When asked about having firearms in his house, Collins told the officers their precise locations. (Id. at 111-12.) It is undisputed that at the time of his arrest, Collins was not wearing a jacket, but that he was given a jacket from inside the house (Kenney Dir. at 18; Menton Dir. at 59; Menton Cross at 62, 81-82; Collins Cross at 109-110, 112), and wore it throughout his interview at the FBI office later that morning. (Menton Dir. at 59-60; Collins Cross at 112-13; Gov't Ex. 2; Gov't Ex. 5.) Once at the FBI office, Collins was read his Miranda rights and signed a Miranda waiver form. (Gov't Ex. 5 at 7:27am.) During Collins's post-arrest interview, Detective Menton thanked Collins for his cooperation, and for his assistance in the recovery of the firearms. (Id.)

The government and Collins submitted post-hearing briefing reinforcing their respective positions.

LEGAL STANDARD

"On a motion to suppress evidence in a criminal trial, once [the defendant] has established a basis for his motion, the burden rests on the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers." United States v. Echevarria, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010) (internal quotation marks and citation omitted); United States v. Strachon, 354 F. Supp. 3d 476, 483 (S.D.N.Y. 2018) ("Defendant's affirmation established the necessary basis for a hearing and put the Government to its proof.").

Law enforcement officers cannot arrest a suspect outside of his home "and then take him inside for the purpose of conducting a warrantless search. On the contrary, it has always been assumed that one's house cannot lawfully be searched without a search warrant,

- 5 -

except as an incident to lawful arrest therein." Shipley v. California, 395 U.S. 818, 820 (1969)

(internal quotation marks and citation omitted). A search is "incident to an arrest only if it is

substantially contemporaneous with the arrest and is confined to the immediate vicinity of the

arrest." Id. at 819 (internal quotation marks and citation omitted) (search of arrestee's home

after he was arrested outside violated Fourth and Fourteenth Amendments).

    Consent is an exception to the general prohibition against warrantless searches.

Katz v. U.S., 389 U.S. 347, 358 n.22 (1967) ("A search to which an individual consents meets

Fourth Amendment requirements . . . ."). Where, as here, the government "seeks to rely upon

consent to justify the lawfulness of a search, [it] has the burden of proving that the consent was,

in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968); see

Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973) (quoting Bumper); United States v.

Isiofia, 370 F.3d 226, 230 (2d Cir. 2004) ("The government has the burden of proving, by a

preponderance of the evidence, that a consent to search was voluntary."). Voluntariness

"requires a fact-based inquiry" and is to be "determined by a 'totality of all the circumstances.'"

United States v. Iverson, 897 F.3d 450, 458 (2d Cir. 2018); Isiofia, 370 F.3d at 231 (quoting

Schneckloth, 412 U.S. at 227). Consenting to law enforcement's entry into a home "must be a

product of that individual's free and unconstrained choice . . . rather than a mere acquiescence to

a show of authority." Iverson, 897 F.3d at 458 (internal quotation marks and citation omitted).

When assessing voluntariness, courts consider "age, education, intelligence, length of detention,

use of physical punishments or deprivations, and whether the alleged consenting person was

advised of his constitutional rights," and where the person whose consent was allegedly given

was in custody, whether "guns were drawn or the consenting individual was frisked . . . [or]

threatened, was in a public area, or was informed that he had the option of refusing consent to the search." United States v. Puglisi, 790 F.2d 240, 243-44 (2d Cir. 1986).

That a person has been arrested or "has been subjected to a display of force does not automatically preclude a finding of voluntariness." United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006). Further, there is no requirement that an arrestee who allegedly gives consent be informed of his right to refuse such consent to search. Schneckloth, 412 U.S. at 232-34. A defendant need not utter "the talismanic phrase: 'You have my permission to search;'" rather, "consent may be inferred from an individual's words, gestures, or conduct." United States v. Buettner-Janusch, 646 F.2d 759, 764 (2d Cir. 1981); see Iverson, 897 F.3d at 458 ("Consent may be express or implied."). "[T]he ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995) (internal quotation marks and citation omitted).

DISCUSSION

I.   The Government has Established, by a Preponderance of the Evidence,
     Collins's Voluntary Consent

Based on the totality of the circumstances, the Court finds that Collins voluntarily consented to the officers entering his home.

The testimony of Detective Menton regarding Collins's request for a jacket was credible. When Collins was arrested outdoors at 6:15am, Detective Menton observed Collins shaking in a manner that indicated that Collins might be cold, and Collins asked for a jacket. (Menton Dir. at 53; Menton Cross at 72.) This testimony was corroborated by the testimony of Special Agent Kenney that prior to entering Collins's home, Detective Menton told Special Agent Kenney that Collins asked for a jacket. (Kenney Dir. at 19; Kenney Cross at 40.) While Collins maintains that he never requested a jacket from inside the house, he did not challenge the

testimony that while inside his house after his arrest, he was provided with a light jacket, and he wore that jacket throughout his post-arrest interview at the FBI office.  (See Kenney Dir. at 18; Menton Dir. at 59-60; Collins Cross at 109-10, 112-13; Gov't Ex. 5.)

    Both Special Agent Kenney and Detective Menton testified that if Collins had not asked for a jacket, the officers would not have entered Collins's house on the day of his arrest; the arrest plan did not involve going inside, as law enforcement had obtained information that, among other concerns, Collins had weapons in the house.  (Kenney Dir. at 13-14; Kenney Cross at 37; Menton Dir. at 49-50, 60-61; Menton Cross at 83, 85.)  Once law enforcement had "mitigated . . . the risk" of entering Collins's residence—for example, by finding out from Collins that his dog was outside in the backyard, and calling Collins's girlfriend to the front door where the officers could see her—they entered the house.  (Kenney Dir. at 25; Menton Dir. at 60-61.)

    That June 13, 2019 was an unseasonably cool morning also lends credibility to the testimony of Special Agent Kenney and Detective Menton that Collins requested a jacket.  The recorded low and high temperatures in the Bronx, New York on June 13, 2019 were 57 and 65 degrees Fahrenheit, respectively.  (Hr'g Tr. at 4-8; Gov't Ex. 1.)  Special Agent Kenney recalled it being a cooler June morning, and wearing a sweatshirt over his tactical gear.  (Kenney Dir. at 15-16.)  Detective Menton also recalled that the weather was "on the chillier side for June." (Menton Redir. at 87.)  Collins testified that when he would get dressed for work, as he stated he was on the morning of June 13, 2019, he would wear a "Carhartt uniform and a long-sleeve shirt with a T-shirt over it, and sometimes, depending on where [he] work[ed], [his] work shirt, which is kind of quilted."  (Collins Dir. at 101-102.)  At the time of his arrest, Collins was wearing long pants, boots, and two shirts, but not a uniform, a quilted work shirt, or a jacket.  (Collins Dir. at

102; Collins Cross at 109-110; see also Kenney Cross at 31-32; Menton Cross at 63; Gov't Ex. 2.)

Despite denying that he ever asked for a jacket, Collins does not challenge the testimony that he was shaking when he was arrested and approached by Detective Menton outside of his house, but testified that he was not cold, "just scared." (Collins Dir. at 107.) He does not claim that the jacket was not his, nor explain why he was wearing the jacket throughout his post-arrest interview indoors at the FBI office. (See Collins Dir. at 108; Collins Cross at 112-13.) In his post-hearing submission, Collins insinuates that the officers instructed or otherwise forced him to wear a jacket, and that he was simply following the officers' directions—out of fear or otherwise—and was "too distracted" by the events of the day to consider removing it. (See Doc 91 at 9-10.) However, Collins never testified to this explanation, nor did the defense put forward other evidence at the hearing to support this version of events.

Both Detective Menton and Special Agent Kenney testified that the officers entered Collins's home after he was arrested based on Collins's consent. Detective Menton testified that he explained to Collins that Collins could not enter the house on his own, and that the officers, including SWAT team members, would have to accompany him inside and "clear" the house. (Menton Dir. at 53; Menton Cross at 72-73, 79-80.) Detective Menton further testified that Collins was "fine" with these conditions of reentering his house, manifested his consent verbally, and told the officers that his girlfriend was inside the house. (Menton Dir. at 53-54; Menton Cross at 73.) Special Agent Kenney's testimony corroborates Collins's manifestation of consent to enter the house, although Special Agent Kenney did not personally hear Collins give consent: "[Collins] was telling us who was inside the house. He wasn't

objecting to it.  He was providing us information on who was inside the house, where his dog was."  (Kenney Cross at 26.)

   Collins denied consenting to the officers entering his house, or that it was explained to him that his house would be searched upon the officers' entry.  (Collins Dir. at 106.) On cross examination, however, Collins testified that he did not ask the officers to leave his house, nor did he object to Detective Menton escorting him inside the house.  (Collins Cross at 110-11.)  During Collins's post-arrest interview, Detective Menton thanked Collins for his cooperation during the arrest and the ensuing recovery of the firearms.  (See Gov't Ex. 5.)

   Collins correctly points out that he had already been arrested, was in handcuffs, and had not been read his Miranda rights at the time he purportedly provided his consent to enter the house.  Further, some of the law enforcement agents involved in Collins's arrest had their weapons drawn.  (See Menton Cross at 70; Collins Cross at 111.)  These circumstances, however, do not nullify Collins's voluntary consent.  See, e.g., United States v. Moreno, 701 F.3d 64, 77 (2d Cir. 2012) ("We have repeatedly observed that neither the fact that a person is in custody nor that [he] has been subjected to a display of force rules out a finding of voluntariness."); United States v. Crespo, 834 F.2d 267, 271 (2d Cir. 1987) ("That [the defendant] was under arrest and in custody, or even handcuffed, does not as a matter of law require a finding of coercion.").  The Court balances these circumstances against the facts that Collins is an adult who understands written and spoken English; that he has past experience with law enforcement (see Kenney Dir. at 13; Kenney Cross at 28 (discussing Collins's criminal history); Gov't Ex. 5 at 7:31am (Collins's statement that he has prior felonies)); and that he asked for and received a jacket from inside his house after being arrested outside.

Collins maintains that he felt threatened during his arrest, which should weigh against a finding of voluntary consent.  Collins testified that Detective Menton was "threatening" when he arrested Collins, "arguing with [Collins], telling [Collins] that somebody told [Menton] what was in [Collins's] house, that something could happen to [Collins's] girlfriend or [his] dog if [Collins] didn't cooperate with them."  (Collins Dir. at 107.)  Detective Menton, however, denied making any threat toward Collins's dog, mentioning cooperating witnesses, or discussing Collins's religion at the time of the arrest.  (Menton Dir. at 54-55.)  Detective Menton further testified that he did not hear anyone else make any such threat or mention these issues to Collins.  (Id.)  Special Agent Kenney also denied hearing anyone threaten Collins's dog, mention a cooperating witness, or discuss Collins's religious beliefs.  (Kenney Dir. at 19.)

Significantly, there was no testimony or other evidence in the record that any threat was made about the officers entering or searching Collins's residence.  Even where there have been such explicit threats to get a warrant and search an arrestee's residence, courts have found ensuing consent voluntary.  See, e.g., United States v. Ceballos, 812 F.2d 42, 51 (2d Cir. 1987) (totality of circumstances weighed in favor of defendant's consent to search being voluntary despite his being "forcibly removed from his place of work in handcuffs," and that agents "sought to persuade [the defendant] to consent to a search . . . . They warned him of the disruption to his household of execution of a court-ordered search warrant.").  Here, the arrest plan did not contemplate entering Collins's residence.  (Kenney Dir. at 13-14; Kenney Cross at 37-39; Menton Dir. at 49, 60-61.)  It was only after Collins requested a jacket that the officers explained that they would have to accompany him inside, entered Collins's residence after he verbally indicated his consent, and he did not otherwise object.  (Menton Dir. at 53-54; Menton Cross at 72-73, 79-80; Collins Cross at 110-11.)

Collins's attempts to cast doubt on Detective Menton's credibility fall short.  For example, Collins points to Detective Menton's inability to recall precisely where in Collins's residence the jacket given to Collins was located.  (Menton Cross at 81-82; Doc 91 at 8.)  That Detective Menton could not recall every detail of an arrest in which he participated over a year ago is unsurprising, and does not undermine his credibility on the key issue of consent.  See United States v. Garcia, 09 cr. 330 (DLI), 2011 WL 6010296, at *8 (E.D.N.Y. Nov. 30, 2011) (testimony not contradictory where agents did not recall exact details of reading defendant his Miranda rights).  Collins's post-hearing submission speculatively argues that none of the other arresting agents heard Collins ask for a jacket, and seems to suggest, therefore, that Detective Menton fabricated Collins's request as a means to enter Collins's residence.  (See Doc 91 at 8-9.) Special Agent Kenney testified that he did not personally hear Collins's request, but that it was relayed to him by Detective Menton, moments after Collins's arrest.  (Kenney Cross at 26; Kenney Redir. at 44.)  Collins's citation to purported instances of perjury by testifying law enforcement officers in other cases is also unavailing.  (See Doc 91 at 10.)  That some members of law enforcement who testify may give false testimony has no bearing on the credibility of Detective Menton or Special Agent Kenney in this case.

Even if the Court were generously to assume that Detective Menton's recollection is in error, and it was he, not Collins, who raised the issue of going inside to retrieve a jacket, this would not change the outcome of the motion.  See United States v. Ansaldi, 372 F.3d 118, 129 (2d Cir. 2004) (where, inter alia, officers asked arrestee "whether he would like to give them his 'pedigree' information outside or inside his house" and arrestee "agreed to give the information inside the house," consent to enter the house was voluntary), abrogated on other grounds by McFadden v. U.S., 576 U.S. 186 (2015).

- 12 -

The defense also makes much of the government not seeking a search warrant for Collins's house ex ante, and not asking Collins to sign a written consent form ex post.  First, the government's decision not to obtain a search warrant is irrelevant to the issue of voluntary consent.  The Second Circuit has found "no significant connection between the failure of the officers to obtain a search warrant . . . and the issue whether they reasonably believed that [the defendant] had consented to their entering his [residence]."  Garcia, 56 F.3d at 424.  Second, written consent is not required.  United States v. Paulino, 12 Cr. 799 (RA), 2013 WL 2237532, at *7 (S.D.N.Y. May 21, 2013) ("It is well-established, however, that consent can be oral or written; a consent to search form is not a prerequisite to finding valid consent."); see also United States v. Wilson, 914 F. Supp. 2d 550, 559 (S.D.N.Y. 2012) ("A suspect may grant officers express consent to search his property either verbally or in writing.").

Based on its assessment of the credibility of the witnesses and all of the evidence presented, the Court finds that it was reasonable for the officers to conclude that Collins voluntarily consented to their entry into his house.  It is therefore unnecessary for the Court to reach the government's alternative argument that the officers did not need Collins's consent to enter the house.  (See Doc 86 at 11-12.)

II.   Collins's Post-Arrest Statements at his House and the Firearms Recovered Will Not be Suppressed

Because the Court finds that the agents were lawfully inside Collins's house based on Collins's consent, the officers properly asked Collins about, and recovered firearms from, his residence.

Pursuant to the public safety exception to Miranda, arresting officers may properly "ask a defendant 'questions necessary to secure their own safety or the safety of the public'" without first giving the defendant Miranda warnings.  United States v. Newton, 369

- 13 -

F.3d 659, 677 (2d Cir. 2004) (quoting New York v. Quarles, 467 U.S. 649, 658-59 (1984)).  This

exception "does not depend upon the subjective motivation of the questioning officer," but

"applies so long as the questioning 'relate[s] to an objectively reasonable need to protect the

police or the public from any immediate danger.'"  Id. (quoting Quarles, 467 U.S. at 655-56, 659

n.8) (alteration in original).  Further, these questions "may not be investigatory in nature or

'designed solely to elicit testimonial evidence from a suspect,'" yet need not be as narrowly

tailored a possible.  United States v. Estrada, 430 F.3d 606, 612 (2d Cir. 2005) (quoting Quarles,

467 U.S. at 658-59).  "Where the public safety exception applies, a defendant's statement—and

the physical evidence recovered as a result of that statement—may be admitted into evidence at

trial."  Id. at 610.

       The officers' need to protect themselves and the public was well-founded in this

case.  When Collins requested to go inside to retrieve a jacket, Detective Menton and Special

Agent Kenney testified that they were looking to mitigate possible threats before entering

Collins's house: they had information that there may have been an "aggressive" dog at Collins's

residence, and that there were weapons in the house.  (Kenney Dir. at 13-14; Menton Dir. at 56-

57.)  They also had information that, inter alia, Collins had a criminal history, was prohibited

from possessing weapons, and was a suspected member of the Bloods gang.  (Menton Cross at

82-83.)  Once the officers confirmed that Collins's dog was in fact in the backyard and they

made contact with his girlfriend by calling her upstairs to where they could see her, Special

Agent Kenney testified that it was still "a threat to leave firearms inside the house;" these were

"illegal" weapons that Collins was not authorized to possess.  (Kenney Cross at 25-26, 38.)

Further, as Detective Menton testified, it would have been dangerous to leave these firearms in

the house because after the officers escorted Collins to their cars to transport him to the FBI

office, his girlfriend "could have used those firearms against [the officers]." (Menton Dir. at 61.)

        Detective Menton's questions to Collins about the location of his dog and his

girlfriend before entering the house, and about any firearms once Collins and the officers were

inside, were proper and aimed at protecting the officers' safety based on these reasonable

concerns. (See Menton Dir. at 58-59.) Once inside, Detective Menton asked Collins "if there

were any firearms in the house, in regards to the safety of our officers going from room to room

clearing [the house]." (Id. at 58.) There is no indication that Detective Menton attempted to

elicit testimonial evidence from Collins or otherwise interview him at the house, or that the

officers conducted an exhaustive search of Collins's residence beyond locating the firearms at

issue. Indeed, both Special Agent Kenney and Detective Menton testified that the officers were

inside Collins's three-story residence for approximately ten minutes in total. (Kenney Dir. at 23-

25; Menton Dir. at 57, 60.)

        Collins told Detective Menton that there were three firearms in the house, and

showed the officers where they were located. (Kenney Dir. at 24; Menton Dir. at 58; Collins

Cross at 111.) During Collins's post-arrest interview at the FBI office, after Detective Menton

read Collins his Miranda rights and Collins signed the Miranda waiver form, Detective Menton

thanked Collins for his cooperation in recovering the firearms. (Gov't Ex. 5 at 7:27-28.)

Detective Menton explained that the officers had to take the firearms from Collins's home, and

Collins stated, in sum and substance, that he understood and that he knew he was not permitted

to have firearms, but had these weapons for religious purposes.[2] (Id. at 7:31.)

---

[2] There has been some conflicting characterization of these firearms. In his affidavit, Collins stated that the three
firearms in his home "were all related to the practice of Santeria, [his] religion." (Doc 50-1 ¶ 12.) At the hearing,
Collins testified that he did not recall stating, at his post-arrest interview, that one of the firearms was not for
religious purposes. (See Collins Cross at 116-18.) The Court has reviewed Collins's post-arrest interview (Gov't

The defense argues that the officers had mitigated the perceived threats against them before entering Collins's house, and therefore that the public safety exception did not apply.  That Collins already had been arrested and his girlfriend accounted for does not change the analysis; as discussed above, the officers had a reasonable basis to believe that leaving illegal firearms in Collins's house could have posed a danger to them or to the public.  (See Kenney Dir. at 25-26; Menton Dir. at 61.)  Even where an arrestee is in custody and officers have accounted for other individuals on the premises who could have posed a threat, the public safety exception still applies.  See Newton, 369 F.3d at 678-79 (public safety exception applied where defendant handcuffed and in custody, and then asked about location of a firearm in his residence); United States v. Nazario, 04 cr 796 (DAB), 2005 WL 2234036, at *4 (S.D.N.Y. Sept. 8, 2005) ("Defendant's argument that the public safety exception also does not apply because the other residents of the apartment were being held separately and were acting peaceably, does not go to the officers' concerns of finding the firearm in the apartment, and ensuring it was not within reach of any of the residents of the apartment."), aff'd, 374 F. App'x 63 (2d Cir. 2010).

For these reasons, the Court finds that Detective Menton's questioning of Collins to locate the firearms in Collins's residence was proper pursuant to the public safety exception, and therefore, Collins's pre-Miranda statements and the recovered firearms will not be suppressed.

CONCLUSION

For the reasons set forth above, defendant Collins's motion is DENIED.  The Clerk is respectfully directed to terminate the motion (Doc 24).

---

Ex. 5), and notes that in response to Detective Menton's question about whether the .44 caliber gun found upstairs in Collins's house was for religious purposes, Collins said that it was not, and that he had not "done anything" with that firearm.  (Gov't Ex. 5 at 7:29am.)  Collins further stated that two of the firearms recovered had not been "prepared."  (Id. at 7:29-31am)

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated:  New York, New York
        September 9, 2020